IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

WAYNE BISHOP,                          *

      Plaintiff,                 *

vs.                                    *

                                 CASE NO. 4:04-CV-40(CDL)

BOMBARDIER, INC., and                  *
BOMBARDIER RECREATIONAL
PRODUCTS, INC.                         *

      Defendants                 *

---

O R D E R

    Defendants' Motion for Summary Judgment (Doc. 31) is presently pending before the Court.   For the reasons set forth below, Defendants' Motion for Summary Judgment is granted.

FACTUAL BACKGROUND

1.   *Plaintiff's Claims*

    This lawsuit arises from an accident involving Plaintiff's Sea-Doo personal watercraft: Plaintiff alleges that while he was attempting to charge the battery of the Sea-Doo, the Sea-Doo caught fire and burned him.   Plaintiff, a resident of Alabama, brings various tort claims against Bombardier Inc., a Canadian corporation which manufactures Sea-Doo personal watercraft in the states of Alabama and Georgia, and Bombardier Recreational Products Inc., a Canadian corporation (collectively "Bombardier").   Specifically, Plaintiff asserts the following causes of action against Bombardier: (1) liability under the Alabama Extended Manufacturers Liability Doctrine, (2) breach of the implied warranty of merchantability under Alabama law, (3) failure to warn, and (4) general negligence. Plaintiff also seeks punitive damages.   Subject matter jurisdiction

in this case is based upon diversity of citizenship.  *See* 28 U.S.C. § 1332.

2.   *Plaintiff's Purchase of the Sea-Doo;*
     *Bombardier's Warnings and Recalls*

On May 31, 2001, Plaintiff purchased a used 1996 SPI Sea-Doo personal watercraft, hull number ZZN26163C696-5878 ("the Sea-Doo"), from James Bryant.  Bryant originally purchased the Sea-Doo from R&S Kawasaki, an authorized Bombardier dealer in Albuquerque, New Mexico, on July 3, 1996.  Prior to Plaintiff's purchase, the Sea-Doo was not repaired under warranty or recall by any Bombardier authorized dealer.  In March 1998, Bombardier had issued a Safety Recall Notice to owners of the 1996 Sea-Doo personal watercraft and to Bombardier's authorized dealers regarding a defect that "may exist in some 1996 Sea-Doo watercraft models."  The notice stated that the fuel filler neck of some watercraft "may be defective" because "a crack may develop in the base of the filler neck," and that could lead to leakage of fuel and/or fuel vapor.  The notice called for an inspection by an authorized Sea-Doo dealer of the fuel tank to ensure the absence of cracks and provided that if any crack was found, a new tank would be installed at no charge to the Sea-Doo owner.  Based on its electronic database of consumers registered as owning a 1996 Sea-Doo personal watercraft,[1] Bombardier sent the 1998 Safety Recall Notice to James Bryant.  Plaintiff did not receive a 1998 Safety Recall Notice.  Neither Bryant nor Plaintiff requested that the 1998 recall inspection be completed.

---

[1] The registered consumer data is generated from records of the original sale and dealer service of Sea-Doo personal watercraft and from information from consumers who contact Bombardier regarding such watercraft.

2

Plaintiff purchased the Sea-Doo from Bryant on May 31, 2001 after seeing it on the side of an Alabama road and water testing it. Plaintiff did not, prior to the accident which gave rise to this lawsuit, notify Bombardier that he was the new owner of the Sea-Doo. Plaintiff did register the Sea-Doo with the State of Alabama in 2001 and each subsequent year.[2]  Upon obtaining the Sea-Doo from Bryant, Plaintiff did not receive any Bombardier literature, such as the Operator's Guide, Safety Handbook, or Safety Video.  Bombardier provided such literature with 1996 Sea-Doo personal watercraft it manufactured and distributed and also provided additional copies of the Operator's Guide upon request.  Plaintiff does not recall requesting an Operator's Guide.  At the time of his purchase, Plaintiff did not receive any repair, warranty, or safety documents relating to the Sea-Doo, and he was not made aware of any safety campaigns or warranty bulletins applicable to the Sea-Doo.  Prior to the accident, Plaintiff did not request or attempt to locate a copy of the Sea-Doo Operator's Guide or any safety campaigns or warranty bulletins relating to the Sea-Doo, and it is not Plaintiff's normal practice to request operator manuals for used products.  Plaintiff has never read the Sea-Doo Operator's Guide, and Plaintiff does not typically read operator's manuals.

When Plaintiff purchased the Sea-Doo, product warnings were affixed to the Sea-Doo, including the following:

◆ WARNING
DO NOT BOOST BATTERY.
SERVICING OF ELECTRICAL COMPONENTS
SHOULD BE DONE BY DEALER ONLY.

and

---

[2] This is according to Plaintiff's deposition testimony.

◆ WARNING
READ ALL WARNING LABELS, OPERATOR'S GUIDE & SAFETY HANDBOOK
before operation.  Severe injury or death can result from
ignoring labels and through improper use of this watercraft.
- Check throttle & steering operation before starting engine.
- Directional control is lost when throttle is released or
  engine shut off.
- Do not splash others or jump waves or wakes with this
  watercraft.
- Operator and passenger should always wear approved life
  vests and recommended clothing.
- Gasoline is explosive.  Always observe proper fueling
  practices and maintenance.
- Properly attach safety lanyard to your life vest.
- This watercraft is not designed for night-time operation.
- Seating is limited to one operator and one passenger (350
  lbs.).
- Keep a safe distance from all other water users.  Be aware
  of all boating regulations.[3]

Plaintiff did not remove any product warning label from the Sea-Doo.
But he did not recall what the warning labels said or whether he had
read them.  In particular, he did not recall the label located near
the seat of the Sea-Doo that warned against boosting the battery.

After his purchase, Plaintiff never took the Sea-Doo to an
authorized Bombardier dealer for repairs or maintenance.  He
performed all maintenance and repairs on the Sea-Doo himself,
including charging the battery, changing the oil, spark plugs, and
battery, and repairing broken fins by removing them and covering the
holes with fiberglass.  Plaintiff did not consult any Bombardier
literature regarding Sea-Doo maintenance or repair.  Plaintiff's
experience with vehicle maintenance and repair was limited to minor
repairs on automobiles, boats, and motorcycles, such as changing
spark plugs and batteries, charging batteries, and changing oil.

In January 2003, Bombardier issued another Recall Notice to
authorized Sea-Doo dealers and to owners (according to Bombardier's

---

[3] Similar warnings were provided in the Sea-Doo Operator's Guide.

database) of 1994 through 1996 Sea-Doo personal watercraft. The 2003 notice stated that Bombardier noticed that a number of its dealers were replacing fuel tanks that had earlier passed inspection and that, "just to be sure," Bombardier decided to replace—at no charge to the owners—all fuel tanks of the 1994 through 1996 Sea-Doo personal watercraft, including those that had passed the earlier inspection. Based on its database of owners, Bombardier identified Bryant as the owner of the subject Sea-Doo and sent him a 2003 Recall Notice.[4]   Plaintiff did not receive the 2003 Recall Notice or any other recall information from Bombardier. Bryant did not contact Plaintiff or Bombardier regarding the 2003 Recall Notice. Plaintiff never requested that the fuel tank in the subject Sea-Doo be replaced as a result of the 2003 notice.

*3. Plaintiff's Accident*

On April 13, 2003, Plaintiff began to perform pre-season maintenance on the Sea-Doo. The Sea-Doo would not start, so Plaintiff towed the Sea-Doo on its trailer to the back of his house in Smiths, Alabama, so he could charge the battery. Plaintiff unhooked the trailer so that it rested on its back frame and the Sea-

---

[4] Plaintiff asserts that Bombardier knew that he owned a 1996 Sea-Doo prior to the accident because he had, before the accident, received promotional brochures from Bombardier and one or more issues of "On Board" magazine, a publication which Plaintiff claims is sent to Sea-Doo owners. However, Plaintiff has pointed the Court to no evidence from which a reasonable juror could conclude that his receipt of "On Board" (or sales brochures) amounts to knowledge on the part of Bombardier that Plaintiff owned a 1996 Sea-Doo. There is no evidence indicating who published "On Board" magazine, how the mailing list for "On Board" was generated, or how "On Board" magazine was distributed. Most notably, there is no evidence that "On Board" was sent exclusively to Sea-Doo owners. For the Court to impute knowledge of Plaintiff's ownership to Bombardier based upon the record presently before the Court, it would have to engage in sheer speculation.

Doo's bow was tilted up at a twenty to thirty degree angle.   When Plaintiff removed the seat of the Sea-Doo to access the engine compartment and charge the battery, he smelled gas.   Plaintiff understood that the fuel tank of the Sea-Doo was located in the engine compartment near the battery, though he did not know how the fuel lines were connected or designed.   He let the engine compartment air out for approximately thirty minutes to one hour, and then he returned to charge the battery.   Before he attempted to charge the battery, Plaintiff did not inspect, check, or tighten any fuel lines; he did not inspect the fuel filler neck; and he did not wipe down the fuel lines or the battery.   Plaintiff did not notice any gasoline in the engine compartment, and he did not smell any gasoline fumes just before he attempted to charge the battery.   Plaintiff plugged in his electric battery charger to an outlet on his porch and set the battery charger on the Sea-Doo's port side running board.   He connected the charger to the negative post and then attempted to hook up the positive post.   When Plaintiff touched the positive battery post to the clamp of the battery charger, he saw a spark and heard a swooshing noise, and then fire came out of the engine compartment. Plaintiff was burned on his head, face, hands, and arms.

4.   *Bombardier's Subsequent Inspection of Plaintiff's Sea-Doo and Conclusions of Bombardier's Expert*

On November 13, 2003, Gilles Nadeau, then an employee of Bombardier, inspected Plaintiff's Sea-Doo at Plaintiff's home. Nadeau was employed by Bombardier for approximately 37 years and was familiar with the components in the 1996 Sea-Doo watercraft and had received training regarding those components.   Nadeau was also familiar with the recommended maintenance, product warning labels,

and Operator's Guide for the 1996 Sea-Doo.  He has inspected "dozens" of Sea-Doo personal watercraft, including their fuel tanks and engine compartments.  During his inspection of Plaintiff's Sea-Doo, Nadeau observed a crack in the fuel filler neck, although he could not determine what caused the crack, when the crack occurred, or that the crack was present prior to or at the time of the accident.[5]  Nadeau also observed loose fuel lines and hoses, as well as a brown fuel residue on the fuel hoses connected to the fuel tank baffle, and he considered the residue to be evidence of a fuel hose or line leak. In addition, Nadeau observed a disconnected battery vent tube and missing battery caps.  Based on his inspection, Nadeau concluded that the flammable substance that ignited the fire was either fuel, fuel vapor, or hydrogen but that the most likely source of the fire was a fuel leak.  As to the source of the fuel leak, Nadeau determined that there were two possible sources: the loose fuel lines or a crack in the filler neck.  Nadeau could not say that one source was more likely than the other.[6]  Nadeau did determine that the spark which

---

[5] Plaintiff disputes that Nadeau could not determine what caused the crack in the fuel filler neck or when the crack occurred.  However, Nadeau testified that he could not make these determinations:

  Q: [Y]ou found a crack in the fuel filler neck, didn't you?
  A: Yes, sir.
  Q: All right, sir.  And that was what caused the gas to leak that caused the explosion?
  A. I cannot say for certainty that the crack was there prior to the fire.  I know that after the fire when I did the inspection six months after the incident, yes, the crack was there.  Was it there prior to the incident, I don't know.

Nadeau Dep. 7-8, Mar. 23, 2005.  Plaintiff has pointed to no evidence reflecting a different conclusion.

[6] Plaintiff contends that Nadeau concluded that the most likely cause of the fire was fuel leakage from the fuel filler neck.  Plaintiff's position is based upon the following Nadeau deposition testimony: (1) Nadeau stated that the most likely cause of the fire was a fuel leak

ignited whatever flammable substance was present was Plaintiff's battery charger.  Nadeau's testimony is the only evidence from an expert relied upon by Plaintiff in his opposition to Bombardier's Motion for Summary Judgment.[7]

Plaintiff contends that the fire and his resulting injuries were caused by a crack in the Sea-Doo's fuel filler neck which allowed gasoline and vapor to leak into the Sea-Doo's engine compartment.  He claims that the Sea-Doo was defective because the fuel filler neck was prone to cracking and because the positioning of the fuel tank

_____

and that there were two likely sources of that fuel leak: the fuel line or a cracked fuel filler neck.  When asked which was more likely, Nadeau said "It's 50/50" but again noted that he could not tell if the crack existed in the fuel filler neck at the time of the incident.
(2) At the time of his deposition, Nadeau was under the erroneous impression that the Sea-Doo was not tilted up at the time of the fire. Prior to the deposition, when Nadeau wrote his report about the inspection, he did note that Plaintiff's Sea-Doo was tilted up at the time of the fire.
(3) Nadeau stated that if a) there was a crack in the fuel filler neck, b) there was a large enough volume of fuel in the tank, and c) the Sea-Doo's bow was tilted up, then gasoline was more likely to leak out of the cracked fuel filler neck than if the Sea-Doo's bow was not tilted up.
(4) Nadeau testified that if there was a crack in the fuel filler neck and the bow was tilted up, the fuel filler neck, which is positioned lower than the gasoline lines coming into the motor, would leak first (assuming, again, there was enough gasoline in the fuel tank).
     Plaintiff contends that based on this testimony, Nadeau's testimony as a whole should be taken to mean that in his expert opinion there is a greater than fifty percent chance that fuel leaking from the fuel filler neck caused the fire.  This is not a justifiable inference from Nadeau's testimony.  Nadeau testified that in his opinion it would not make a difference if the Sea-Doo was tilted or not because the problem causing the explosion was most likely gas vapors, which would escape even if the boat was not tilted.  He also testified that he did not know how much gasoline was in Plaintiff's tank, and there is no evidence that there was a large enough volume of gasoline in Plaintiff's Sea-Doo to cause a leak at the fuel filler neck, assuming the fuel filler neck was cracked.  Finally, Nadeau testified that he did not know whether the fuel filler neck was cracked before the fire.

     [7] Although another expert could conceivably provide the opinions that Plaintiff attributes to Nadeau, the present record does not support Plaintiff's interpretation of Nadeau's opinions.

and battery in the engine compartment was unreasonably dangerous.  He also contends that Bombardier breached its duty to notify him of the recall and to warn him of the dangers associated with boosting the battery.   Plaintiff further argues that Bombardier breached the implied warranty of merchantability and that punitive damages are warranted in this case.  Defendants move for summary judgment as to each of Plaintiff's claims.

## DISCUSSION

Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Defendants in this case are entitled to summary judgment if after construing the evidence in the light most favorable to Plaintiff and drawing all justifiable inferences in his favor, no genuine issues of material fact exist to be tried.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment.  *Id.* at 247-48.  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

*1. Defective Product Claims*

Plaintiff brings product liability claims under both the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and negligence theories. To establish a prima facie case under both liability theories, Plaintiff must show that (1) the Sea-Doo was a defective product, (2) the Sea-Doo's defect was traceable to Bombardier and was the cause of Plaintiff's injury, and (3) the Sea-Doo reached Plaintiff without substantial modification to the condition in which it was sold. *See Casrell v. Altec. Induc., Inc.*, 335 So.2d 128, 132-33 (Ala. 1976) (defining prima facie case for AEMLD claims); *Atkins v. Am. Motors Corp.*, 335 So.2d 134, 141 (Ala. 1976) (defining prima facie case for negligence claims). Thus, the key questions in this diversity case are whether the alleged defects existed in Plaintiff's Sea-Doo and whether those alleged defects caused his injury. These questions must be answered under Alabama law. Therefore, the precise inquiry for the Court is whether as a matter of Alabama law the evidence considered in the light most favorable to Plaintiff creates a genuine issue of material fact as to the existence of the alleged defects in Plaintiff's Sea-Doo and their role in causing Plaintiff's injury. *See Hessen v. Jaguar Cars, Inc.*, 915 F.2d 641, 647 (11th Cir. 1990).

Under Alabama law, a "defect" is that which renders a product unreasonably dangerous. The term "defective" means that the product is not fit for its intended purpose because it does not meet the reasonable expectations of an ordinary customer as to safety. *See Casrell*, 335 So.2d at 133. Plaintiff cannot establish a prima facie case under either liability theory by simply showing that he was injured or that the Sea-Doo failed in furthering or performing its

10

intended use—he must present evidence to support the conclusion that the Sea-Doo was defective.  *See Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.*, 395 So.2d 991, 995 (Ala. 1981).  Plaintiff contends that the subject Sea-Doo had two defects:  a cracked fuel filler neck and a design which placed the battery inside the engine compartment with the fuel tank.  The Court must examine the record presently before it to determine whether sufficient evidence exists from which a reasonable jury could conclude that either or both of these alleged defects existed and caused the fire giving rise to Plaintiff's injuries.

   *a. Fuel Filler Neck*

   Plaintiff contends that the fuel filler neck in his Sea-Doo was defective because it was cracked.  He further contends that it was the cracked fuel filler neck that leaked the fuel which was ignited when he attempted to charge the battery.  If Plaintiff produces evidence from which a reasonable jury could conclude that the fuel filler neck was cracked prior to the fire, then that may be sufficient to create a jury question regarding whether Plaintiff's Sea-Doo was defective within the meaning of Alabama law.  In support of his contention that the fuel filler neck was cracked prior to the fire, Plaintiff points the Court to the testimony of Bombardier's expert, Gilles Nadeau, and to evidence of two recall campaigns regarding the fuel tank of the 1996 Sea-Doo.[8]  For the reasons

---

[8] Expert testimony is generally required in AEMLD cases, particularly when a lay juror could not, in the absence of expert testimony, draw the inference that the product at issue was defective and caused the plaintiff's injury.  *Cook v. Sunbeam Prods., Inc.*, 365 F. Supp. 2d 1189, 1191-92 (N.D. Ala. 2005) (interpreting Alabama law); *see also Haven Hills Farm*, 395 So.2d at 995.  The fuel system at issue in this case—and the timing of the development of the crack in the fuel filler neck—is not

discussed below, this evidence is insufficient to satisfy Plaintiff's burden of creating a genuine fact issue regarding whether the fuel filler neck was cracked prior to the fire. Thus, Bombardier is entitled to summary judgment on Plaintiff's product liability claims based on the alleged cracked fuel filler neck.

#### i. Nadeau's Testimony

The testimony of Bombardier's expert, Gilles Nadeau, establishes that Nadeau observed a crack in the fuel filler neck of Plaintiff's Sea-Doo *after* the fire. Nadeau could not, however, determine what caused the crack, when the crack occurred, or that the crack was present prior to or at the time of the accident. It is true that Nadeau's testimony, taken in the light most favorable to Plaintiff, establishes that the most likely source of the fire was a fuel leak. However, Nadeau identified two possible sources of the fuel leak: loose fuel lines or a crack in the filler neck, and he could not say that one source was more likely than the other. "'Proof which goes no further than to show an injury could have occurred in an alleged way does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'" *Ex Parte Mobile Power & Light Co., Inc.*, 810 So.2d 756, 760 (Ala. 2001) (quoting *Southworth v. Shea,* 131 Ala. 419, 421, 30 So. 774, 775 (1901)). In *Mobile Power & Light*, the plaintiff sued his electrical contractor regarding electrical connections in a panel box which caused a house fire. The plaintiff's expert testified that the cause of the fire was a loosened connection which

---

within the reasonable purview of the average layperson and therefore requires expert testimony or other sufficient evidence of the existence of the defect.

was caused by one of three possible defects, only one of which was potentially attributable to the defendant electrical contractor. *Id.* at 760. Because the plaintiff's expert could not point to any one possibility as more probable than the others, the court found that his testimony as to defect and causation amounted to unsubstantiated conjecture and therefore did not suffice to create a genuine issue of material fact. *Id.* at 761. In this case, Nadeau's testimony regarding the source of the fuel leak is likewise speculative—it does not point to *one* potential fuel leak source as more probable than the other. Therefore, Nadeau's testimony is not sufficient to support a finding that a cracked fuel filler neck in Plaintiff's Sea-Doo caused the fire. *See id.* at 760-61.

Plaintiff seeks to distinguish *Mobile Power & Light* by asserting that there *is* evidence in this case pointing to a single theory of causation because, according to Plaintiff's interpretation of Nadeau's testimony, Nadeau concluded that there is a greater than fifty percent chance that fuel leaking from the fuel filler neck caused the fire. This is simply not a justifiable inference from Nadeau's testimony. *See supra* note 6. Nadeau's testimony does not support a finding that the fuel filler neck was more likely than not cracked prior to the fire or that a cracked fuel filler neck was the probable source of the fuel leak which caused the fire. Although a qualified expert may have been able to reach this conclusion based on an inspection of Plaintiff's Sea-Doo, a careful review of the record reveals that Nadeau did not.

### ii. Evidence of Recalls

Even if Nadeau's testimony does not establish defect and causation in this case, Plaintiff argues that evidence of recalls of

13

the 1996 Sea-Doo due to a potential problem with the fuel filler neck, combined with the crack in the fuel filler neck of Plaintiff's Sea-Doo, creates a genuine issue of material fact on the question whether the crack in the fuel filler neck of Plaintiff's Sea-Doo existed prior to the fire.   Plaintiff contends that evidence of product recalls is "permissible where such evidence is offered to establish an existing condition at the time of the accident."   In support of this argument, he points the Court to cases holding that evidence of subsequent remedial measures, such as repairs, is relevant to show that a condition existed at the time of an accident. *See, e.g.*, *Baptist Med. Ctrs. v. Trippe*, 643 So.2d 955, 962 (1994)*; Leeth v. Roberts*, 295 Ala. 27, 31, 322 So.2d 679, 682 (1975). Neither of these cases involved product recalls as the subsequent remedial measure, and neither is applicable to the instant case.

Plaintiff also points the Court to *Hessen v. Jaguar Cars, Inc.*, 915 F.2d at 641, and claims that it stands for the proposition that evidence of a product recall is admissible as evidence that the recall defect existed in the subject product.   This is an inaccurate statement of the rule articulated in *Hessen*—the *Hessen* court did *not* admit the recall notice as evidence that the recall defect existed in the subject product, and the Court declines to do so here.

In *Hessen*, the plaintiff presented evidence that his Jaguar vehicle caught fire because of a potentially defective fuel injector system, and the Eleventh Circuit found no error in the admission of a product recall of Jaguar vehicles with the same potential defect. *See Hessen*, 915 F.2d at 649.   However, the district court in *Hessen* had admitted evidence of the recall campaign with the specific limitation that it could *not* be considered by the jury in determining

14

whether or not a defect existed in the subject Jaguar. *Id.* at 649
n.16. Rather, the *Hessen* district court instructed the jury that if
it found "that the plaintiff has demonstrated by a preponderance of
the *other evidence* that a defect existed in his vehicle and that the
defect proved as the same which led to the recall," then the jury
could "consider the recall evidence along with other evidence in
determining whether the defect existed in the vehicle while it was in
the hands of the defendant." *Id.* (emphasis added).[9]  *See also
Aleksandrov v. Chevrolet Motor Div.*, 116 F.3d 482 (9th Cir. 1997)
(finding recall notice stating that some Geo Metros may have hood
latch defect was insufficient to create genuine fact issue as to
whether the defect existed in the particular Metro at issue in the
case); *Bailey v Monaco Coach Corp.*, 350 F. Supp. 2d 1036, 1045 (N.D.
Ga. 2004) (noting that manufacturer's recall notice "does not admit
a defect in a particular product, but refers to the possibility of a
defect in a class of products").  In this case, Plaintiff has
presented no "other evidence" to establish that a crack more likely
than not existed in the fuel filler neck prior to the fire or that
such a crack was more likely than not the cause of the fire.  For
these reasons, the Court finds that the recall evidence is
insufficient to create a genuine fact issue as to whether the

---

[9] The *Hessen* court found that the plaintiff had offered sufficient
evidence to create a jury question on the existence of defect and the
defect as the cause of the fire because the plaintiff's expert witness
testified (1) that he considered the design of the fuel injector
system—specifically the connection method of the rail and the hose to the
No. 3 injector—to be defective because it was subject to a lot of potential
deterioration, (2) that as a result of the deterioration, the system
distributing the fuel in Plaintiff's vehicle was prone to rupture or leak,
and (3) the cause of the fire was a leak from the defective fuel hose or
fuel hose connection. *Hessen*, 915 F.2d at 648.

particular Sea-Doo in this case had a cracked fuel filler neck prior to the fire.

   b. *Engine Compartment Design*

   Plaintiff also contends that the engine compartment design of the 1996 SPI Sea-Doo design was defective because it placed the battery inside the engine compartment with the fuel tank.  He argues that this design is so obviously defective that any reasonable person would see the defect, and expert testimony is therefore not required to prove the defect.  It is true that expert testimony is not always required to prove defect, but to obviate the need for an expert the defect must not be complicated and technical in nature.  *See Goree v. Winnebago Indus., Inc.*, 958 F.2d 1537, 1541-42 (11th Cir. 1992) (finding that expert testimony was not required to show specific defect because plaintiff demonstrated floorboard on the driver's side of his vehicle reached temperatures well above those which could cause burn injuries).  The safe placement of a fuel tank and battery on a personal watercraft is complex and technical in nature and not within the purview of the average layperson, so this case is distinguishable from *Goree*, and Plaintiff must produce some evidence (other than his "it's obvious" assertion) to establish that the Sea-Doo's engine compartment design was defective.  *See id.*; *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So.2d 839, 858 (Ala. 2002)*.

   Plaintiff could prove that the Sea-Doo's engine compartment was defective if he could show that "a safer, practical, alternative design" was available to Bombardier when it manufactured the Sea-Doo. *Hannah*, 840 So.2d at 858.  A safer, practical, alternative design must be proved by showing that:

16

> (a) *The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design;* and that (b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the *utility of the alternative design outweighed the utility of the design actually used.*

*Id.* (first emphasis in original; second emphasis added). Expert testimony is generally used to demonstrate that a safer, practical, alternative design existed. *See, e.g., id.* at 859-60 (finding genuine issue of material fact on alternative design based on testimony of three experts); *cf. Goree*, 958 F.2d 1537, 1541 (noting that expert testified that vehicle's defective condition could have been alleviated by installation of a $25 heat shield).

Plaintiff has not presented any evidence (expert testimony or otherwise) to demonstrate that a safer, practical, alternative design existed for the Sea-Doo engine compartment. At most, he has established that other companies designed the engine compartments of some of their personal watercraft differently than Bombardier did.[10] However, it is not enough to show that a feasible alternative design *could have been* developed by proper use of the manufacturer's resources; Plaintiff must present evidence from which a jury could find that his specific suggested alternatives were technically feasible in terms of costs and the over-all design and operation of the Sea-Doo. *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1510 (11th Cir. 1990); *see also Yarbrough v. Sears, Roebuck & Co.*, 628 So.2d

---

[10] Plaintiff's evidence on this point consists of Nadeau's acknowledgment that some unidentified Yamaha personal watercraft have the battery outside the engine compartment. Nadeau also noted that some other Yamahas have the battery inside the engine compartment.

478, 482 (Ala. 1993) (finding insufficient evidence of safer alternative design in part because there was no detail or explanation of proposed alternative design); *Beech v. Outboard Marine Corp.*, 584 So.2d 447, 450 (citing 11th Circuit's *Elliott* decision on this point). This, Plaintiff has not done. He has not suggested any specific alternative design for the Sea-Doo engine compartment; he has not shown that his injuries would have been eliminated or reduced by use of an alternative design; and he has not presented any evidence to show that the utility of an alternative design outweighed the utility of the design actually used. For these reasons, Plaintiff has failed to present sufficient evidence that the Sea-Doo's engine compartment design was defective, and Bombardier is entitled to summary judgment as to Plaintiff's claims regarding this alleged defect.

*2. Implied Warranty of Merchantability Claim*

In addition to his AEMLD and negligence claims, Plaintiff brings a claim for breach of implied warranty of merchantability. Such a claim may be sustained if goods are not "fit for the ordinary purposes for which such goods are sold." Ala. Code. § 7-2-314(2)(c) (1975). To establish his claim for breach of implied warranty of merchantability, Plaintiff must prove "the existence of the implied warranty, breach of that warranty, and damages proximately resulting from that breach." *Ex Parte General Motors Corp.*, 769 So.2d 903, 912 (Ala. 1999). Pretermitting the question whether Plaintiff as a remote customer can state a claim for breach of implied warranty of merchantability against Bombardier, Plaintiff has failed to present evidence sufficient to show that the Sea-Doo was not fit for its ordinary purposes. Although the question whether goods are

merchantable is not exactly the same as the question whether goods are defective under the AEMLD, *see id.* at 913, under an implied warranty of merchantability theory there still must be evidence sufficient to demonstrate that the Sea-Doo was not fit for its ordinary purpose—that it did not carry with it an "inherent soundness" which made it suitable for its designed purpose. *DaimlerChrysler Corp. v. Morrow*, 895 So.2d 861, 864 (Ala. 2004). *See, e.g., Bagley v. Mazda Motor Corp.*, 864 So.2d 301, 315 (Ala. 2003) (finding evidence of breach because on the day plaintiff purchased the car, the wheel came off while plaintiff was driving). Plaintiff contends that he has offered sufficient evidence to prove breach of implied warranty. Specifically, he contends that he has shown that the Sea-Doo was not fit for its ordinary purpose because it had a crack in the fuel filler neck which allowed fuel to leak and caused the fire which injured Plaintiff. As discussed *supra*, however, Plaintiff has not presented sufficient evidence to demonstrate a genuine fact issue regarding whether a crack existed in the fuel filler neck prior to the fire and caused the fuel leak which resulted in the fire. Therefore, Bombardier is entitled to summary judgment on Plaintiff's implied warranty of merchantability claim.

*3. Failure-to-warn Claim*

Plaintiff claims that Bombardier failed to provide adequate warning of the risks of harm involved in using the Sea-Doo. He contends that Bombardier breached its duty to warn in two ways: first, it failed to adequately warn him of the dangers associated with boosting the battery, and second, it failed to notify him of the recall information regarding his Sea-Doo. As to the first alleged breach, Bombardier responds that Plaintiff has failed to present

sufficient evidence that any inadequacy in the warnings was the proximate cause of Plaintiff's injury.[11]  Regarding the second alleged breach, Bombardier contends that Plaintiff's failure-to-warn claim based on his non-receipt of the recall notices is preempted by federal law and that, in any event, there is no evidence that Bombardier knew Plaintiff had purchased the Sea-Doo from Bryant.

   *a. Warnings Regarding Boosting the Battery*

   Plaintiff asserts that Bombardier failed to adequately warn him of the dangers associated with boosting the battery.  This failure, he contends, gives rise to a negligent failure-to-warn claim and a claim under the AELMD that the Sea-Doo was defective due to inadequate warnings.  Alabama recognizes both types of claims, and a critical element of each is proximate cause.  *Clarke Indus., Inc. v. Home Indem. Co.*, 591 So.2d 458, 461 (Ala. 1991).  For that reason, unless the alleged inadequacy is such that the plaintiff was prevented from reading the warning, a failure-to-warn case cannot be submitted to a jury unless there is evidence that the allegedly inadequate warning would have been read and heeded and would have prevented the accident.  *Sears, Roebuck & Co. v. Harris*, 630 So.2d 1018, 1030 (Ala. 1994); *accord E. R. Squibb & Sons, Inc. v. Cox*, 477 So.2d 963, 971 (Ala. 1985).

-----

   [11]  Bombardier also argues that its warnings regarding battery boosting were adequate and that it had no duty to warn Plaintiff because the risk of boosting the battery (by introducing a battery spark in the engine compartment) was open and obvious since Plaintiff knew that the fuel tank was in the engine compartment along with the battery and that fuel or fuel vapor had been present in the engine compartment within an hour before the accident.  Because the Court resolves this issue on proximate cause grounds, *see infra*, it is unnecessary to reach these questions.

In this case, Plaintiff does not allege that the warnings on the Sea-Doo were inadequate with respect to prominence or that they were presented in a manner which prevented him from reading them. Rather, his complaint is that the *content* of the warnings did not explain what sort of danger, if any, one might encounter if he attempted to boost, charge, or jump-start the battery. There were warning stickers on the Sea-Doo when Plaintiff bought it, including a warning not to boost the battery. It is undisputed that Plaintiff does not recall reading the warnings and that he does not recall what they said. Plaintiff could have read the allegedly inadequate, unspecific warnings as easily as he could have read an adequate, specific warning. But because there is no evidence that Plaintiff read or heeded the existing warnings, there is no evidence from which a reasonable juror could infer that Plaintiff would have read and heeded a more specific warning. Therefore, it would not have mattered if there *had* been such a warning because it would not have altered Plaintiff's course and prevented his injury. *See E. R. Squibb & Sons, Inc.*, 477 So.2d at 971; *see also Gurley v. Am. Honda Motor Co.*, 505 So.2d 358, 361 (Ala. 1987) (finding insufficient evidence to support jury question on proximate cause when motorcycle passenger failed to read and/or heed warning that motorcycle was not built to accommodate passengers). The instant case is distinguishable from cases in which there *was* evidence that the product user read and followed at least some of the manufacturer's instructions, thus creating a jury question as to whether he would have read and heeded additional instructions and prevented the accident. *See Harris*, 630, So.2d at 1030; *see also Clarke Indus., Inc.,* 591 So.2d at 461 (finding jury question on causation because

21

there was evidence that the product user did read and heed all warnings that were available to him and that there was no warning regarding the specific risk which caused the accident). For these reasons, the Court finds that Plaintiff has not presented sufficient evidence to create a jury issue on the element of causation for these failure-to-warn claims, and Bombardier is thus entitled to summary judgment on them.

b. *Recall Notices Regarding the 1996 Sea-Doo*

Plaintiff also argues that Bombardier should be held liable on a failure-to-warn theory because it breached its obligation to send him, the subsequent owner of the Sea-Doo, any recall notices regarding the Sea-Doo.[12] First, he contends that Bombardier knew he purchased the Sea-Doo but failed to send him any recall notices regarding the fuel filler neck. There is no evidence that Bombardier knew that Plaintiff had purchased the Sea-Doo. It is undisputed that Plaintiff did not notify Bombardier of his purchase. Additionally, there is no evidence that Plaintiff's receipt of Sea-Doo promotional magazines indicates that Bombardier was aware of Plaintiff's Sea-Doo ownership. Second, Plaintiff asserts that Bombardier should be held liable because it failed to send him recall notices even though it

---

[12] Bombardier contends that this failure-to-warn claim is preempted by the Federal Boat Safety Act ("FBSA") provisions regarding repair and replacement of defects. *See* 46 U.S.C. § 4310 (2005) (requiring notification of potential defect to "subsequent purchasers if known to the manufacturer"). Though the FBSA, specifically the preemption clause upon which Bombardier relies, does not expressly preempt state common law claims regarding recreational vessel safety*, see Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002), Bombardier suggests that field or conflict preemption may apply in this case. The Court does not reach this question because even if Plaintiff's claims are *not* preempted, there is insufficient evidence to support Plaintiff's asserted common law claims for failure to notify him of the recall campaigns.

*should have known* that he was the owner of the Sea-Doo because he registered the vessel with the State of Alabama after he purchased it. However, Plaintiff points to no authority—and the Court finds none—supporting his contention that under Alabama law a failure-to-warn claim may be predicated upon a manufacturer's failure to send a recall notice to subsequent purchasers of its products whose identity the manufacturer could have known by researching state records. Furthermore, even if this were the law, Plaintiff has pointed the Court to no evidence that Bombardier could have known he purchased the Sea-Doo based on his vessel registration with the State of Alabama: there is nothing in the record to show that Bombardier had access to State of Alabama records regarding recreational vessel registrations. For these reasons, Plaintiff's failure-to-warn claim based on Bombardier's failure to send him recall notices cannot overcome summary judgment.

### 4. *Punitive Damages Claim*

Because Plaintiff has failed to create a genuine issue of material fact on any claim against Bombardier that might give rise to compensatory or nominal damages, he cannot recover punitive damages, and Bombardier is entitled to summary judgment on this claim. *See Life Ins. Co. of Ga. v. Smith*, 719 So.2d 797, 806 (Ala. 1998).

### CONCLUSION

For the foregoing reasons, Bombardier's Motion for Summary Judgment is granted. The Court does not reach this conclusion lightly. It understands that issues of defect, negligence, and proximate cause typically should be resolved by a jury and not the Court as a matter of law. Understanding that summary disposition of

23

such issues is the exception rather than the rule, the Court carefully searched the record in this case for genuine issues of material fact.  That search discovered none but instead found only speculation and conjecture.  Therefore, duty-bound to follow the law, the Court can reach only one conclusion:  no genuine issue of material fact exists to be tried in this case.  Accordingly, the law requires that summary judgment be granted in favor of Defendants.

IT IS SO ORDERED, this 16th day of November, 2005.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE